0876

SHONEY'S INC., a Tennessee Corporation, and First Federal Savings & Loan Association, Respondents v. Raymond R. COOKE, James T. Wiggins, M.D., Paul Franklin Chumley, George H. Fann, and T. D. Ravenel, Jr., Appellants.

(353 S. E. (2d) 300)

Court of Appeals

*D. Cravens Ravenel,* of *Belser, Baker, Barwick, Ravenel, Toal & Bender,* Columbia, *for appellants.*

*Michael W. Tighe* and *Susanne A. Hawkins,* of *Callison, Tighe, Rush, Robinson & Anastasion,* Columbia, *for respondents.*

Heard Dec. 10, 1986.

Decided Feb. 9, 1987.

GOOLSBY, Judge:

This is a declaratory judgment action brought by the respondent First Federal Savings and Loan Association and Shoney's, Inc., seeking an order declaring that certain property owned by First Federal and subject to a contract of sale to Shoney's is free from all restrictions, except those of public record. The appellants are the owners of other property purchased from the same tract from which the property belonging to First Federal was sold. The trial judge rendered judgment in favor of First Federal and Shoney's giving them the declaration that they sought. We affirm.

The issues on appeal are whether the acceptance of a deed tendered in performance of an agreement to convey certain property merged the agreement to convey in the deed and whether the property is subject to an implied reciprocal negative easement.

Lexington Park Associates, a South Carolina Limited Partnership, purchased a 6.5 acre tract of land in Lexington County to develop a professional office complex. It recorded a plat of the property that divides the tract into nine lots. Eight of the lots front on a street referred to on the plat as "Professional Avenue." A legend on the plat states that it is a "plat ... of Lexington Office Plaza."

Lexington Park gave Lexington County Savings and Loan Association, which financed the development of the 6.5 acre tract for Lexington Park, a written option to buy three lots reflected on the plat. The option recites that the property "has, or will have restrictions limiting its use to professional office type commercial businesses, including bank type institutions. . . ."

Lexington Savings thereafter exercised its option and bought the three lots from Lexington Park. The deed conveying these lots to Lexington Savings states that the "conveyance is made subject to all ... restrictions ... and covenants of record. . . ." At the time of the conveyance, however, there were no restrictions or covenants of record. Indeed, Lexington Park never recorded any restrictions or covenants limiting the use of the nine lots shown on the plat.

When it purchased the three lots, Lexington Savings intended to build a bank building thereon; however, adverse conditions prevented it from doing so. Lexington Savings eventually merged with First Federal.

Shoney's contracted to buy the three lots from First Federal after First Federal determined it had no use for the property. Shoney's intends to build a restaurant and motel upon the property.

Lexington Park also conveyed lots from the 6.5 acre tract to the appellants Raymond R. Cooke, James T. Wiggins, George H. Fann, T. D. Ravenel, Jr., and Paul Franklin Chumley. The conveyances to Cooke, Fann, and Ravenel were made pursuant to written contracts of sale. Fann's and Ravenel's contracts contain a reference to restrictions but Cooke's contract does not. None of the deeds conveying a lot or lots from the 6.5 acre tract to the appellants contains a restriction limiting the use of the property.

The appellants improved their lots by building thereon a pharmacy, a physician's office, dentists' offices, a veterinarian's office, and an insurance office.

First Federal and Shoney's initiated this action seeking a declaration that the property is free from any restriction that would prevent its use as a motel and restaurant. The appellants counterclaimed seeking a declaration that all lots conveyed from the 6.5 acre tract by Lexington Park are subject to a covenant restricting their use to professional offices and that the restaurant and motel proposed by Shoney's are inconsistent with a use of that kind.

The case was heard by the trial judge sitting without a jury. He implicitly found that Lexington Savings' acceptance of the deed tendered in performance of Lexington Park's agreement to convey, which is embodied in the option, merged the agreement to convey in the deed and that the deed alone now regulates the rights and liabilities of the parties. He expressly found that Lexington Park abandoned either at or prior to the time of its conveyance of the property to Lexington Savings its intention to impose a common scheme of development upon the 6.5 acre tract and that there is no implied reciprocal negative easement that would prevent the use of First Federal's property as a motel and restaurant.

### I.

We discuss first the appellants' arguments regarding merger.

### a.

The appellants maintain that Lexington Savings' acceptance of Lexington Park's deed in performance of the agreement to convey the three lots did not extinguish the antecedent agreement to restrict the use of the three lots because the parties did not intend for a merger to occur.

In *Charleston & Western Carolina Railway Co. v. Joyce*, 231 S. C. 493, 99 S. E. (2d) 187 (1957), the Supreme Court fully discussed the doctrine of merger. They observed, while quoting from *Snyder v. Roberts*, 45 Wash. (2d) 865, 871, 278 P. (2d) 348, 352 (1955), and from 55 Am. Jur. *Vendor and Purchaser* § 327 at 756 (1946):

> "The doctrine of merger is founded upon the privilege, which parties always possess, of changing their contract obligations by further agreements prior to performance.

The execution, delivery, and acceptance of a deed varying from the terms of the antecedent contract indicates an amendment of the original contract, and generally the rights of the parties are fixed by their expressions as contained in the deed. [Citations omitted.]"

. . . . .

". . . Where there is no mistake or fraud a deed executed subsequently to the making of an executory contract for the sale of land is generally regarded as conclusive evidence of a previous modification of the executory contract. A deed executed subsequent to the making of an executory contract for the sale of land supersedes that contract. . . ."

231 S. C. at 504-05, 99 S. E. (2d) at 193.

In *Hughes v. Greenville Country Club*, 283 S. C. 448, 322 S. E. (2d) 827 (Ct. App. 1984), we noted that this state recognizes the contrary intent exception to the merger doctrine. We held in *Hughes*, however, that "the party denying merger has the burden of proving by clear and convincing evidence that merger was not intended." 283 S. C. at 451, 322 S. E. (2d) at 828.

Here, then, the acceptance by Lexington Savings of the deed tendered by Lexington Park in performance of its agreement to convey the three lots to Lexington Savings from the 6.5 acre tract merged the agreement to convey in the deed absent proof by clear and convincing evidence that the parties did not intend to merge the agreement to convey in the deed.

To establish a contrary intent, the appellants point to the title of the tract and the name of the street shown on the plat, Lexington Park's intent to develop a professional office complex on the 6.5 acre tract, the loan made by Lexington Savings to Lexington Park to finance the development of the 6.5 acre tract, the language in the option and in two of the contracts of sale that restricts the use of the property to professional buildings or offices, Lexington Savings' original intention to build a savings and loan office building on its lots, and the uses made by the appellants of their respective lots since acquiring them.

On the other hand, there is evidence of an amendment to

the original contract between Lexington Park and Lexington Savings beyond the mere execution, delivery, and acceptance of a deed that varies from the terms of their antecedent contract. Lexington Park recorded not one but seven deeds without ever placing upon the public record any restriction limiting the use of the 6.5 acre tract. Further, one of the three contracts of sale Lexington Park entered into with other parties makes no reference to any restriction limiting the use of the property. Also, one of the developers of Lexington Office Plaza, when he was called to testify, proved unable to explain why a restriction limiting the use of the tract was never recorded.

Under these circumstances, we agree with the view of the trial judge, implicitly stated, that the appellants failed to prove by clear and convincing evidence that merger was not intended when Lexington Park executed and delivered and Lexington Savings accepted a deed at variance with the option.

b.

The appellants also maintain that the stipulation in the purchase agreement that the three lots either had or would have "restrictions limiting [their] use to professional office type commercial businesses, including bank type institutions," constitutes a collateral agreement that survives the deed.

Another exception to the general rule that a deed made in full execution of a contract of sale of land merges the provisions of the contract in the deed is the exception that a collateral agreement is not necessarily merged in the subsequent deed. 26 C. J. S. *Deeds* § 91c at 845-46 (1956). The appellants, however, also failed to establish this exception by clear and convincing evidence.

To constitute a "collateral agreement," the agreement must be independent and distinct from the main contract, be consistent with the provisions of the main contract, and be such an agreement as the parties could not reasonably be expected to embody in the main contract but would naturally make as a separate agreement. *Chertkof v. Spector Baltimore Terminal, Inc.*, 236 Md. 550, 284 A. (2d) 215 (1971). A stipulation in an executory contract for the

sale of land to limit the use of the land to be conveyed hardly fits this definition. *See Marron v. Scarbrough*, 44 Tenn. App. 414, 314 S.W. (2d) 165 (1958) (doctrine of merger applied where a written contract of sale did not reflect an oral agreement that for ten years the purchaser would not mine any gravel from the premises except for residential purposes and that if any gravel were removed the purchaser would fill and level holes and pits so that the property could be used for residential purposes); *Men About Town v. Budde*, 292 Ky. 394, 166 S.W. (2d) 305 (1942) (execution of a deed expressly stating that property could not be used for other than residential or agricultural purposes rendered unenforceable a prior representation that the restriction would not be enforced against a purchaser).

## II.

The appellants next argue that a restriction limiting the use of First Federal's property to "professional office type commercial businesses" arose by implication.

"Generally speaking, a restrictive covenant may arise by implication from the language of the deeds, or from the conduct of the parties." 20 Am. Jur. (2d) *Covenants, Conditions, and Restrictions* § 173 at 732 (1965). For a reciprocal negative easement to arise by implication, the implication must be plain and unmistakable. *Edwards v. Surratt*, 228 S. C. 512, 90 S. E. (2d) 906 (1956). Our Supreme Court requires four elements to establish a reciprocal negative easement by implication. There must be: (1) a common grantor; (2) a designation of the land or tract subject to restrictions; (3) a general plan or scheme of restriction in existence for the designated land or tract; and (4) restrictive covenants that run with the land. *Bomar v. Echols*, 270 S. C. 676, 244 S. E. (2d) 308 (1978). In determining whether a reciprocal negative easement has been created, the court should consider the language found in the deeds and the surrounding circumstances. *Nance v. Waldrop*, 258 S. C. 69, 187 S. E. (2d) 226 (1972). All doubts regarding the creation of an implied reciprocal negative easement must be resolved in favor of the freedom of land from servitude. *Bomar v. Echols, supra.*

Here, no language in any of the seven deeds conveying the lots reflected on the subdivision plat limits the use of the property to professional offices or businesses. In fact, the omission of such a restriction from each of the seven deeds tends to show either that no general scheme exists [*Pitts v. Brown*, 215 S. C. 122, 54 S. E. (2d) 538 (1949)] or that, if a general scheme did exist, the grantor abandoned it. *See* 20 Am. Jur. (2d) *Covenants, Conditions,* and *Restrictions* § 177 at 741 (1965) (omission of restrictions in some of the conveyances of lots in a subdivision being developed under a general scheme of restrictions may constitute an abandonment or waiver of the restrictions when considered in connection with other circumstances). Furthermore, this omission, particularly when coupled with the fact that not all of the agreements to convey seek to limit the use of the property to be conveyed, enforces the inference that the restriction represents a personal contract only. *Pitts v. Brown, supra.*

We recognize that a recorded plat of the 6.5 acre tract professes to be a "plat ... of Lexington Office Plaza" and shows a street named "Professional Avenue." But the plat shows no restrictions of any kind and the grantor, when conveying lots in reference to the plat, imposed no restrictions on any of them. Without more, simply giving names to a recorded plat and to a street shown thereon does not establish a general plan or scheme. *Cf. Summers v. Beeler*, 90 Md. 474, 45 A. 19 (1899) (a general plan or scheme was not shown where, among other things, the recorded plat from which lots were sold did not show any restrictions and no restrictions were imposed on some of the lots first sold).

We also recognize that the appellants developed their lots in conformity with a professional office or business restriction; however, a "reciprocal negative easement[ ] cannot arise and fasten upon one lot simply by reason of other lot owners conforming to a general plan." 20 Am. Jur. (2d) *Covenants, Conditions,* and *Restrictions* § 173 at 735 (1965).

Accordingly the judgment is,

Affirmed.

BELL and CURETON, JJ., concur.